# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | 3:16cr220-1 |
| | : | |
| **v.** | : | **(Judge Munley)** |
| | : | |
| **WILLIAM WYLIE, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is Defendant William Wylie's motion for pretrial relief. (Doc. 362). In his motion, Defendant Wylie seeks to: (1) dismiss certain counts of the criminal indictment; (2) suppress all evidence seized from the search of several packages intercepted by United States postal agents; (3) suppress all evidence seized from his residence and building; and (4) suppress statements he made following his December 29, 2015 detention hearing. Having been fully briefed, with a suppression hearing held on the motion on September 30, 2019, this matter is now ripe for disposition.

## Procedural History

On August 9, 2016, a grand jury returned a multi-count indictment against Defendant Wylie[1] in connection with his alleged distribution of alpha-pyrrolidinopentiphenone (hereinafter "Alpha-PVP"), a Schedule I controlled

---

[1] The indictment also charged six (6) other individuals.

substance commonly known as "bath salts."  (Doc. 1, Indictment).  The

indictment charged Defendant Wylie with six (6) criminal counts, including:

conspiracy to distribute and possess with intent to distribute Alpha-PVP[2] ("Count

1"); conspiracy to import Alpha-PVP from China into the United States[3] ("Count

2"); knowingly, intentionally, and unlawfully attempting to possess with intent to

distribute Alpha-PVP[4] ("Count 3"); knowingly using, carrying, and brandishing a

firearm during and in relation to, and in furtherance of, a drug trafficking crime[5]

("Count 4"); possessing a firearm in furtherance of a drug trafficking crime[6]

("Count 5"); and unlawfully possessing a firearm as a convicted felon[7] ("Count

6").  (Id.)  On August 11, 2016, Defendant Wylie pleaded not guilty to the charges

brought against him.  (Doc. 43, Plea).

Defendant Wylie filed the instant motion for pretrial relief, along with a

supporting brief, on May 1, 2019.  (Docs. 362 & 363).  The government filed a

brief in opposition on May 9, 2019.  (Doc. 374).  The court held a suppression

hearing on the motion on September 30, 2019.  (Doc. 450, Notes of Testimony,

Suppression Hearing (hereinafter "N.T.")).  The parties then filed supplemental

---

[2] 21 U.S.C. § 841(a)(1).

[3] 21 U.S.C. §§ 952 and 960(a)(1).

[4] 21 U.S.C. § 841(a)(1).

[5] 18 U.S.C. § 924(c)(1)(A)(ii) and (2).

[6] 18 U.S.C. § 924(c).

[7] 18 U.S.C. § 922(g)(1).

briefs following the hearing, (Docs. 458 & 459), bringing this case to its present posture.

**Factual Background[8]**

Testimony at the suppression hearing revealed the following facts, which will be discussed at greater length *infra*: In November of 2014, Special Agent Jeffrey Burke ("Special Agent Burke"), an investigator for the Department of Homeland Security, Homeland Security Investigations ("HSI"), began investigating the importation and distribution of Alpha-PVP by Defendant Wylie and others.  (N.T. at 7; Doc. 451, Def.'s Ex. No. 1 at ¶¶ 8-9).  As part of this investigation, Special Agent Burke contacted United States Postal Inspector David Heinke ("Inspector Heinke") and requested that he place parcel watches on certain addresses linked to Defendant Wylie.  (N.T. at 18-19).

On March 14, 2015, pursuant to the parcel watch, Inspector Heinke informed Special Agent Burke that he had intercepted a package from China.  ("Package #1").  (Id. at 55, 61).  Inspector Heinke subsequently detained Package # 1 and applied for a search warrant, which was issued on March 31, 2015 (the "March 31 Search Warrant").  (Id.)  Special Agent Burke also applied

---

[8] Unless otherwise specified, the court takes the facts articulated herein from the transcript of the suppression hearing held on September 30, 2019.

3

for a search warrant of Defendant Wylie's residence and building, which was executed on December 21, 2015 (the "Search Warrant"). (N.T. at 24).

Following Defendant Wylie's arrest, a detention hearing was held on December 29, 2015. (Id. at 66). After the hearing, Defendant Wylie's former counsel, Assistant Federal Public Defender Leo Latella ("Attorney Latella"), asked Special Agent Burke to detail some of the evidence against Defendant Wylie. (Id. at 69-70). During the encounter, Defendant Wylie uttered two (2) inculpatory statements. Defendant Wylie subsequently engaged in formal proffer sessions held on January 20, 2016 and February 10, 2016.

**Discussion**

Defendant Wylie's motion for pretrial relief consists of the following: (1) a motion to dismiss Count 4 and Count 5 of the criminal indictment; (2) a motion to suppress all evidence seized from the search of parcels intercepted by Inspector Heinke and U.S. postal agents; (3) a motion to suppress the evidence seized from his residence and building; and (4) a motion to suppress his post-detention hearing statements. The Court will address each issue in turn.

**I.    Motion to Dismiss Counts 4 and 5 of the Indictment**

In his motion, Defendant Wylie seeks dismissal of two (2) firearm counts of the Indictment. Defendant Wylie argues that these counts should be dismissed because the government's evidence is insufficient as a matter of law to establish

these alleged violations.[9]  The government responds that Defendant Wylie merely attempts to have this court determine before trial that the government has insufficient evidence to prove these counts.  The government further submits that the court may not consider evidentiary questions in ruling on a pretrial motion to dismiss an indictment.  After careful review, we agree with the government.

The law provides that "[a]n indictment is an accusation only, and its purpose is to identify the defendant's alleged offense . . . and fully inform the accused of the nature of the charges so as to enable him to prepare any defense he might have." United States v. Stanfield, 171 F.3d 806, 812 (3d Cir. 1999) (quotations and citations omitted).  A defendant may move to dismiss an indictment based on defects in the indictment, including lack of specificity or failure to charge an offense. FED. R. CRIM. P. 12(b)(3)(B).  However, unless a stipulated record exists or immunity issues are implicated, "dismissal[ ] may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." United States v. Delaurentis, 30 F.3d 659, 660–61 (3d Cir. 2000); United States v. Shober, 489 F. Supp. 393, 412 (E.D. Pa. 1979) ("Whether the

---

[9] Specifically, Count 4 charges Defendant Wylie with knowingly using, carrying and brandishing a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (2), and Count 5 charges him with knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

government lacks evidence to support the charges contained in the indictment is a matter to be resolved at trial.").

During the execution of the Search Warrant, law enforcement officers found the firearm at issue behind a false wall in first-floor closet of Defendant Wylie's duplex property. Given that no drugs or paraphernalia were found in the same location, Defendant Wylie contends that the firearm was not readily accessible for use in connection with drug transactions. Defendant Wylie further asserts that the government has no proof that he actively employed the recovered firearm. As such, Defendant Wylie claims that the evidence is insufficient to establish that the firearm had any relation to drug trafficking activity.

In support of his argument, Defendant Wylie relies on the non-binding decision in United States v. Hall, 20 F.3d 1084 (10th Cir. 1994). In Hall, the Tenth Circuit Court of Appeals affirmed the pretrial dismissal of an alleged firearm offense under 18 U.S.C. § 924(c) based on the insufficiency of the government's evidence. Id. at 1086. Significantly, the parties in Hall did not dispute the underlying facts of the firearm charge, and the government failed to object to the court's consideration of evidence outside the indictment prior to trial. Id. at 1086-87. In upholding the pre-trial dismissal under such circumstances, the Tenth Circuit determined that "the government must do more than point to the presence of a firearm in a residence to establish its 'use' for purposes of section

6

924(c)(1)." Id. at 1088.  The court emphasized, however, that its holding was a

narrow one:

> Although we recognize that the preferred approach in testing the
> sufficiency of an indictment cautions against consideration of the
> strengths and weaknesses of the government's case through fact-
> finding pretrial hearings . . . [Tenth Circuit precedent] allows a district
> court to dismiss charges at the pretrial stage under the **limited
> circumstances where the operative facts are undisputed and the
> government fails to object to the district court's consideration of
> those undisputed facts in making the determination regarding a
> submissible case.**  Under this scenario, a pretrial dismissal is
> essentially a determination that, *as a matter of law,* the government is
> incapable of proving its case beyond a reasonable doubt.  **We note,
> however, that such a scenario is not likely to recur and we
> caution both the trial courts and counsel that the procedure here
> employed is indeed the rare exception.**

Hall, 20 F.3d at 1088 (emphasis added).

Here, given the binding Third Circuit precedent that precludes the

consideration of evidence outside the indictment upon evaluating its sufficiency

at the pretrial stage, the court is not persuaded by Defendant Wylie's reliance on

Hall.  See DeLaurentis, 230 F.3d at 660–61; see also United States v. Sampson,

371 U.S. 75, 78–79 (1962) ("An indictment should be tested solely on the basis of

the allegations made on its face, and such allegations are to be taken as true.").

Further, unlike in Hall, the court is not presented with a stipulated record, and the

government clearly objects to considering the sufficiency of its evidence at this

juncture.  Accordingly, Defendant Wylie's motion to dismiss Counts 4 and 5 of

the indictment will be denied.

## II.    Motion to Suppress Evidence Seized by U.S. Postal Agents

Next, we will address Defendant Wylie's motions to suppress.  The first motion involves the detention and search of several packages by U.S. Postal Authorities.  During the investigation, Special Agent Burke received information from a confidential defendant ("CD #1") that Defendant Wylie used his basement office to store envelopes of Alpha-PVP that came from China.  (N.T. at 10).  Special Agent Burke then contacted Inspector Heinke regarding potential addresses linked to Defendant Wylie where he could accept such packages.  (Id. at 18-19).  Based on the information provided by Special Agent Burke, Inspector Heinke placed parcel watches on the addresses associated with Defendant Wylie.  (Id. at 19, 61).  This ultimately led to the detention and search of Package #1, followed by four (4) other parcels (collectively, the "Packages").  (Doc. 452, Gov't's Ex. No. 1 at ¶¶ 24, 30, 40).

Defendant Wylie moves to suppress all evidence obtained from the search of the intercepted Packages.  Specifically, Defendant Wylie argues that (1) Inspector Heinke lacked reasonable suspicion to initially seize Package #1, and each of the parcels detained thereafter, and (2) probable cause did not exist to support a search of the Packages.  Defendant Wylie thus seeks suppression on the grounds that all evidence obtained from the Packages constitutes "fruit of the poisonous tree."  The government responds that Inspector Heinke had more than

reasonable suspicion to initially detain, and probable cause to search, Package #1 and the subsequently intercepted Packages.  We agree with the government.

1.  <u>Inspector Heinke had reasonable suspicion to detain Package #1.</u>

Under the law: "Consistent with the Fourth Amendment, a postal inspector may detain a mail parcel for inspection only if he has a **reasonable suspicion** that it contains contraband."  <u>United States v. Colon</u>, 386 F. App'x 229, 230–31 (3d Cir. 2010) (emphasis added) (citing <u>United States v. Van Leeuwen</u>, 397 U.S. 249, 251–52 (1970)).  "Reasonable suspicion that a mail parcel contains contraband for purposes of temporary detention is evaluated under a totality of the circumstances standard."  <u>United States v. Hayes</u>, 603 F. App'x 74, 75 (3d Cir. 2015) (citations omitted).  While a "mere hunch" is insufficient to establish reasonable suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (citations omitted); <u>see also</u> <u>United States v. Robertson</u>, 305 F.3d 164, 168 (3d Cir. 2002) (noting that an officer's "experience and training [are] indispensable to his evaluation of reasonable suspicion.").

At the suppression hearing, Inspector Heinke testified that he received intensive training in narcotics investigation as a postal inspector.  (N.T. at 51).  In

9

his six (6) years of experience with the United States Postal Service, Inspector Heinke also stated that he participated in hundreds of criminal investigations involving the shipment and transport of narcotics by mail. (Id. at 51-52). One such investigation included a separate homeland security investigation into Todd Morgans ("Morgans"), the region's main trafficker of Alpha-PVP prior to being arrested, which dealt with the illegal importation of Alpha-PVP from China. (Id. at 7, 54). Based on his training and experience, Inspector Heinke additionally indicated that China was a known source country for the shipment of illegal drugs into the United States. (Id. at 56, 58).

With respect to the events that led to the detention of Package #1, Inspector Heinke stated that Special Agent Burke initially contacted him with information, provided by CD #1, that Defendant Wylie had filled the supply void left by Morgans' arrest. (Id. at 46, 53). Special Agent Burke specifically advised that Defendant Wylie was importing large quantities of Alpha-PVP from China and utilizing the same distribution network as Morgans. (Id. at 18-19, 53). Special Agent Burke further conveyed that Defendant Wylie was receiving shipments at 31 Vine Street, Wilkes Barre, Pennsylvania ("31 Vine Street"). (Id. at 19-20, 54-55). Accordingly, Inspector Heinke placed a mail watch on parcels shipped to that address. (Id. at 54-55).

On March 14, 2015, Inspector Heinke contacted Special Agent Burke pursuant to the mail watch and notified him that postal agents had intercepted a parcel from China (Package #1) addressed to "Williams" at 29 Vine Street, Wilkes Barre, Pennsylvania ("29 Vine Street").[10] (Id. at 55, 61-62). Special Agent Burke searched for the parcel's return address on an HSI database, which revealed that Customs and Border Protection had seized contraband from packages bearing the same return address on six (6) separate occasions between February 5, 2015 and March 13, 2015. (Id. at 13, 21-22, 55-56).

Considering these facts, the totality of the circumstances provided Inspector Heinke with reasonable suspicion to detain Package #1 on March 14, 2015. Inspector Heinke knew, based on his specialized training and experience, that China was a source country for illegal drugs coming into the United States. He additionally understood that the investigation into Defendant Wylie shared several similarities with the Morgans case,[11] which had also involved transporting Alpha-PVP from China by mail. Special Agent Burke further informed Inspector Heinke that the return address listed on Package #1 was linked to six (6) known shipments of illegal contraband that had occurred within the past five (5) weeks.

---

[10] Inspector Heinke added 29 Vine Street, which adjoined Defendant Wylie's duplex property located at 31 Vine Street, to the mail watch list at a later point in the investigation. (N.T. at 61-62).

[11] Based on the hearing testimony, there is no direct connection between the Defendant Wylie investigation and the Morgans investigation. (N.T. at 23).

Inspector Heinke therefore did not detain Package #1 based on a "mere hunch" that it contained contraband, but rather a "'particularized and objective" suspicion. See Arvizu, 534 U.S. at 273 (citations omitted). As such, the initial detention of Package #1, followed by the subsequent detentions of the other Packages, did not violate the Fourth Amendment. Defendant Wylie's motion to suppress evidence on this ground will therefore be denied.

2. The magistrate judge had a substantial basis for finding that probable cause existed to search Package #1.

After Package #1 was detained, Inspector Heinke applied for and obtained a search warrant for the parcel. (N.T. at 58). The execution of the March 31 Search Warrant resulted in the discovery of approximately 300 grams of Alpha-PVP. (Id. at 14, 58). Inspector Heinke subsequently detained and searched four (4) other packages addressed to Defendant Wylie from China. (Doc. 452, Gov't's Ex. No. 1 at ¶¶ 24, 30, 40).

Defendant Wylie now argues that even if Inspector Heinke had reasonable suspicion to seize Package #1 on March 14, 2015, the supporting affidavit for the March 31 Search Warrant lacked probable cause. Upon issuing a search warrant, a magistrate judge is tasked with making "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983)). This initial

"probable cause" determination is entitled to great deference, and not subject to de novo review.  Id. at 237.  As such, "[a] reviewing court must determine only that the magistrate judge had a 'substantial basis' for concluding that probable cause existed to uphold the warrant."  United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (citing Gates, 462 U.S. at 238-39); United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) ("Even if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard.").

Here, the affidavit at issue outlined the training and experience of both Inspector Heinke and Special Agent Burke, including their familiarity with methods employed by drug trafficking organizations to obtain illegal narcotics by mail.  (Doc. 451, Def.'s Ex. No. 1).  The affidavit also detailed the investigation into Defendant Wylie, the circumstances surrounding the initial detention of Package #1 (as well as the six (6) contraband seizures associated with its Chinese return address), and Defendant Wylie's connection to the parcel's intended address of 29 Vine Street.  (Id.)  Additionally, the affidavit contained information gleaned from a November 2014 interview with CD #1, who had made statements against his/her penal interests by admitting to their involvement in

Defendant Wylie's drug trafficking operation over a span of several months.[12]

(Id.)  As provided in the affidavit, CD #1 had personally observed Defendant

Wylie in possession of Alpha-PVP, advised that Defendant Wylie purchased

large quantities of Alpha-PVP from a Chinese supplier over the internet, and

informed agents that Defendant Wylie referred to "tracking numbers" whenever

he anticipated a shipment's arrival.  (Id.)

Upon considering the affidavit in support of the March 31 Search Warrant,

while also remaining mindful of the court's deferential standard of review, we are

satisfied that the issuing magistrate judge had a substantial basis to conclude

that probable cause existed to search Package #1.  For these reasons,

Defendant Wylie's motion to suppress all evidence seized from the Packages by

postal inspectors will be denied.

### III.  Motion to Suppress Evidence Seized from Defendant Wylie's Residence and Building

The court now considers Defendant Wylie's second motion to suppress,

which involves the seizure of evidence from his residence and building located at

---

[12] Defendant Wylie argues that relying on the information provided by CD #1 did not supply probable cause to search Package #1, as Special Agent Burke did not know of his/her veracity and reliability.  The Supreme Court has held, however, that these elements, in addition to an informant's basis of knowledge, "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."  Illinois v. Gates, 462 U.S. 213, 230 (1983).

31-29 Vine Street, Wilkes-Barre, Pennsylvania (the "Premises").  (N.T. at 24).

Defendant Wylie avers that the evidence seized from the Premises should be

suppressed on the grounds that: (1) the Search Warrant failed to meet the Fourth

Amendment's particularity requirement; (2) a search of the whole Premises was

overbroad; and (3) the good faith exception to the exclusionary rule does not

apply.  The government responds that Defendant Wylie's challenges are

meritless, as the Search Warrant accurately described the Premises and

authorized a search of the entire structure.  For the reasons that follow, we agree

with the government.

      After conducting covert surveillance of the Premises, Special Agent Burke

applied for and obtained the Search Warrant.  (Id. at 24).  Attachment A to the

Search Warrant application ("Attachment A") described the place to be searched

as follows:

> The WILLIAM WYLIE residence and building is located at 31-29 Vine
> Street in Wilkes-Barre, Pennsylvania [].  The residence is a 4-story
> duplex home with a tan and red brick and white/light brown trim.  31
> Vine Street is situated on the left side of the duplex with 29 Vine
> Street situated to the right.  The numbers '31' and '29' are affixed to
> the respective front beams on the common shared front porch which
> is accessed by red painted walk up stairs from the street level.
> Numerous external surveillance cameras are affixed to various
> locations of the entire structure referred to as 31-29 Vine Street.  A
> driveway is situated along the right side of the house which runs the
> length of the house to the rear of the property where several
> detached outbuildings are located on the property.

(Id. at 9).

The supporting affidavit of probable cause (the "Affidavit"), which was incorporated into the Search Warrant by refence, provided that Defendant Wylie owned and had access to the left side of duplex where he resided (31 Vine Street), the right side of the duplex that was being renovated (29 Vine Street), and the large basement office where he maintained his automobile repossession business.  (Id. at 10; Doc. 452, Gov't's Ex. No. 1 at 1).

The Affidavit also contained information from several confidential defendants regarding Defendant Wylie's use of, and control over, the entire Premises.  According to CD #1, Defendant Wylie "conducted his drug trafficking activities in both the office and residence portion of the house but that the computer [he] used to order and track the shipments of Alpha-PVP was located in the basement office."  (N.T. at 10-11, 15, 33-34).  The Affidavit further stated that a second cooperating defendant ("CD #2") had personally observed the basement area and indicated that Defendant Wylie kept a desk where he weighed out Alpha-PVP, a safe where he stored Alpha-PVP and money, a shotgun by the desk, and an alarm system equipped with surveillance cameras.  (Id. at 15-16).  Another confidential defendant ("CD #3") advised that Defendant Wylie had drug paraphernalia "all over the place" and possessed firearms down in his office.  (Id. at 16, 34).

On December 21, 2015, following Defendant Wylie's arrest, Special Agent Burke executed the Search Warrant. (Id. at 42-43). Law enforcement officers searched the entire Premises, including 29 Vine Street and 31 Vine Street, and made forced entry into Defendant Wylie's basement office. (Id. at 42). As a result of the search, law enforcement officers recovered a .22 caliber rifle and a safe from behind a false wall in a closet located on the first floor of the Premises. (Id. at 71; Doc. 451, Def.'s Ex. No. 6 at 18). Although law enforcement officials did not recover any firearms from the basement, Special Agent Burke testified that a search of the office area revealed a "very large amount of ammunition, blasting caps and black powder." (N.T. at 43).

1. Particularity of the Search Warrant

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. CONST. amend. IV. Generally, "searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (citations omitted). The Warrant Clause of the Fourth Amendment additionally prohibits "the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" Maryland v. Garrison, 480 U.S. 79, 84 (1987). Evidence obtained pursuant to a warrant that lacks

particularity may be suppressed under the exclusionary rule. United States v. Leon, 468 U.S. 897, 906 (1984).

To comport with the Fourth Amendment's particularity requirement, a search warrant's description of the place to be searched must "be such that the officer . . . can with reasonable effort ascertain and identify the place intended." Garrison, 480 U.S. at 91 (quoting Steele v. United States, 267 U.S. 498, 503 (1925)). The purpose of this requirement is to prevent general and wide-ranging exploratory searches. Id. "Ultimately, the particularity requirement intends that 'nothing is left to the discretion of the officer executing the warrant.'" United States v. Perez, 712 F. App'x 136, 139 (3d Cir. 2017) (quoting Marron v. United States, 275 U.S. 192, 196 (1927)). A warrant need not be technically perfect, however, as "[t]he standard . . . is one of practical accuracy rather than technical nicety." United States v. Bedford, 519 F.2d 650, 655 (3d Cir. 1975).

In support of his particularity challenge, Defendant Wylie emphasizes that the Search Warrant failed to delineate the ground floor office of Bill's MTAR Towing, Inc., located at 31 ½ Vine Street ("Bill's MTAR Towing"). Defendant Wylie thus contends that the Search Warrant was overbroad and invalid. Defendant Wylie's argument largely rests on his characterization of the Premises as an undisclosed multi-occupancy building, with the office of Bill's MTAR Towing akin to a separate commercial unit. (N.T. at 48). Defendant Wylie also cites to

the Supreme Court's decision in Garrison, which stands for the proposition that the validity of an overbroad search warrant, insofar as it fails to particularize a separate sub-unit occupied by an innocent third-party, "must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." See Garrison, 480 U.S. at 85.

The court is not persuaded by Defendant Wylie's reliance on Garrison. In Garrison, police officers obtained a search warrant for "the premises known as 2036 Park Avenue third floor apartment." Id. at 80. Significantly, the officers reasonably believed that the third floor only contained a single unit upon applying for the warrant. Id. at 81. The officers discovered, however, that the third floor consisted of two separate apartments after executing the warrant and finding contraband in the unit that belonged to a neighboring third-party. Id. After considering the information that was available to the officers, and their reasonable understanding of the third floor's configuration at the time the warrant issued, the Supreme Court held that the subsequent discovery of the search warrant's overbreadth did not render it invalid. Id.

Here, Special Agent Burke neither specifically identified the basement of the Premises as 31 ½ Vine Street in the Search Warrant, nor expressly requested authorization to search the corporate office of Bill's MTAR Towing. (N.T. at 47). However, unlike in Garrison, Special Agent Burke did not first

19

discover the existence of Defendant Wylie's business office upon executing the

Search Warrant. Rather, at the time he obtained the Search Warrant, Special

Agent Burke knew that Defendant Wylie operated his vehicle repossession

business from the basement[13] of the Premises. (Id. at 10, 15, 33, 49). Special

Agent Burke also received information from several confidential defendants that

Defendant Wylie exercised dominion over the entire Premises, despite its duplex

design. This matter is thus distinguishable from Garrison, insofar as the portion

of the Premises at issue was not utilized by an undisclosed third-party as a

separate dwelling; instead, it was utilized by Defendant Wylie, the intended

subject of the Search Warrant, as an office for the vehicle repossession business

that he owned.[14]

---

[13] During the suppression hearing, Defendant Wylie characterized his business as a "ground floor office," whereas Special Agent Burke characterized the same as a converted "basement office." (N.T. at 47-48). Special Agent Burke also testified that, inclusive of the basement level, the Premises comprised of four (4) stories. (Id. at 48). Notably, the photograph provided in Attachment A depicts a four (4) story structure with walk-up stairs that lead to a common front porch. (Doc. 452, Gov't's Ex. No. 1 at 2). The Affidavit further details that Defendant Wylie had control over the entire Premises, which he typically accessed through a street-level basement door. (N.T. at 15). As the street level of the Premises was located beneath the level with a common front porch, the court finds that characterizing Defendant Wylie's vehicle repossession business as a "ground floor" or "basement" office is a distinction without a difference.

[14] Defendant Wylie also cites to United States v. Ritter, 416 F.3d 256 (3d Cir. 2005) for the proposition that the search of the Premises was unreasonably executed. (Doc. 458 at 12-14). Like in Garrison, the officers in Ritter obtained a search warrant for what they believed to be a single-unit dwelling. Ritter, 416

Additionally, the court is satisfied that the description of the Premises was accurate enough for an executing officer to reasonably "ascertain and identify the place intended." Garrison, 480 U.S. at 91. The language of the Search Warrant expressly identified the place to be searched as Defendant Wylie's "residence **and** building," and, as articulated in the incorporated Affidavit, several confidential defendants advised that Defendant Wylie utilized his basement office to facilitate criminal drug activity. (N.T. at 9, 49) (emphasis added). The Affidavit further disclosed that Defendant Wylie had used a telephone number registered to Bill's MTAR Towing to contact the post office about the whereabouts of Package #1, which had ultimately been seized and found to contain contraband. (Id. at 15, 34-35). Considering the information set forth in the Search Warrant, Attachment A, and the Affidavit in totality, which demonstrates a clear nexus between the entire structure and the illegal conduct alleged in the Search Warrant, the court finds that the issuing Magistrate authorized a search of the whole Premises—including a search of the office portion of the building where Defendant Wylie operated Bill's MTAR Towing. See Torres v. United States, 200 F.3d 179, 187 (3d Cir. 1999) ("[A] warrant encompasses the authority to search

---

F.3d at 265-66. They did not realize, however, that the target location comprised of separate residential units until they executed the search warrant in question. Id. Accordingly, the court finds that Defendant Wylie's reliance on Ritter is similarly misplaced.

the entire building if the person who is the target of the search has access to or control over the entire premises."); <u>Bedford</u>, 519 F.2d at 655 (noting that a search warrant's description of the suspect location need not be technically precise, but instead requires practical accuracy); <u>U.S. v. Johnson</u>, 26 F.3d 669, 694 (7th Cir. 1994) (finding that a search warrant satisfied the particularity requirement, despite failing to include the specific address of an upper unit located in the target duplex building, when it reasonably authorized a search of the entire premises).  Accordingly, the court finds that the Search Warrant is not invalid for lack of particularity,[15] as it identified the intended place to be searched with enough specificity to comport with the Fourth Amendment.

      2.  <u>Reasonableness of the Execution of the Search Warrant and the Good Faith Exception</u>

Defendant Wylie also avers that the execution of the Search Warrant was unreasonable, as, upon discovering the multi-occupancy character of the Premises, the officers should have realized the warrant's overbreadth and stopped the search.  The Third Circuit has explained that once officers know, or should have known, of an error in what is encountered versus what is authorized by a warrant, they are "obligated to either limit the search to those areas clearly covered by the warrant or discontinue entirely their search."  <u>United States v.</u>

_____

[15] The court notes that Defendant Wylie does not challenge whether probable cause existed to search the basement office of the Premises.

<u>Ritter</u>, 416 F.3d 256, 266 (3d Cir. 2005) (quoting <u>Maryland v. Garrison</u>, 480 U.S. 79, 87 (1987)).  However, as discussed *supra*, the court is satisfied that the Search Warrant validly encompassed the entire Premises, including the office of Bill's MTAR Towing located in the basement.  Accordingly, the overbreadth concerns presented in <u>Garrison</u> and <u>Ritter</u> are not applicable here.  Similarly, as the court concludes that the Search Warrant is not invalid for lack of particularity, we will not consider whether the good faith exception to the exclusionary rule applies.  For these reasons, Defendant Wylie's motion to suppress all evidence seized from the Premises pursuant to the Search Warrant will be denied.

### IV.    Motion to Suppress Post-Detention Hearing Statements

In his final motion to suppress, Defendant Wylie argues that two (2) inculpatory statements he made are inadmissible under Rule 410 of the Federal Rules of Evidence and Rule 11 of the Federal Rules of Criminal Procedure. Specifically, Defendant Wylie submits that he made these statements during a plea discussion, or an informal "reverse proffer" arrangement.  The government contends that Defendant Wylie's argument is meritless, as he did not relay his statements in the context of an off-the-record proffer session.  Although a close call, we agree with Defendant Wylie.

During the suppression hearing, Special Agent Burke testified that Defendant Wylie made the statements at issue following his detention hearing on

December 29, 2015. (N.T. at 66). According to Special Agent Burke, Attorney Latella approached him and Task Force Officer William Schutter ("Officer Schutter") in the courtroom and inquired about whether they "would be willing to give a synopsis of the evidence" to Defendant Wylie. (<u>Id.</u> at 67). As Special Agent Burke understood the situation, Attorney Latella made this request in an effort to persuade Defendant Wylie to potentially cooperate. (<u>Id.</u>) Special Agent Burke and Officer Schutter, who had been talking to the prosecuting attorney when Attorney Latella approached them, agreed to detail some aspects of the case against Defendant Wylie. (<u>Id.</u> at 67). No one explicitly mentioned a proffer session or provided a proffer agreement to Attorney Latella and Defendant Wylie at that time. (<u>Id.</u> at 66-68).

During the conversation that ensued, Special Agent Burke advised that law enforcement officers had recovered a firearm from a hidden location within the Premises. (<u>Id.</u> at 70). Defendant Wylie then allegedly responded "[o]h yeah, the .22 rifle" ("Statement 1"). (<u>Id.</u>) This prompted Attorney Latella to immediately caution Defendant Wylie and state "remember, Bill, I told you this is where they talk, and you listen." (<u>Id.</u> at 71).

Special Agent Burke proceeded to discuss other elements of the government's case. (<u>Id.</u> at 73-74). Defendant Wylie eventually indicated that he would be willing to cooperate and provide information regarding drug activity in

other counties.  (Id.)  Special Agent Burke then asked if Defendant Wylie was referring to drug activity in Ashland, Pennsylvania, to which Defendant Wylie purportedly replied "wow, you guys really were on to me" ("Statement 2").  (Id.) The conversation concluded shortly thereafter, and a report of the incident indicated that "investigators advised a full interview would be set up with [Defendant] Wylie in the near future."  (Id. at 74).

Twenty-two (22) days later, on January 20, 2016, Defendant Wylie signed a proffer letter and engaged in a formal proffer meeting.  (Id. at 74-75).  Defendant Wylie then participated in a follow-up proffer session on February 10, 2016.  (Id. at 75).

Based on these events, at issue is whether the conversation between Defendant Wylie, Special Agent Burke and Officer Schutter, in the presence of Attorney Latella and the prosecuting attorney, qualifies as a "plea discussion" to which the exclusionary rule applies.  Rule 410 of the Federal Rule of Evidence provides:

> In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions . . . (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

FED. R. EVID. 410.

Rule 11 of the Federal Rules of Criminal Procedure similarly states that FED. R. EVID. 410 governs "[t]he admissibility or inadmissibility of a plea, plea discussion,

25

and any related statement. . . ." FED. R. CRIM. P. 11. "[T]he history of [FED. R. EVID. 410 and FED. R. CRIM. P. 11] and the comments in the Advisory Committee Notes strongly suggest that the rules were intended to extend to proffer sessions where discussions occur between counsel for the government and counsel for the defendant 'with a view toward reaching a plea agreement.'" United States v. Stein, No. CR. 04-269-9, 2005 WL 1377851, at *11 (E.D. Pa. June 8, 2005); see also FED. R. CRIM. P. 11 advisory committee's note to 1979 amendment ("[B]y relating the statements to 'plea discussions' rather than 'an offer to plead,' the amendment ensures 'that even an attempt to open plea bargaining [is] covered under the same rule of inadmissibility.'" (citing United States v. Brooks, 536 F.2d 1137 (6th Cir. 1976))).

In determining whether a statement has been made in the course of plea discussions, courts have adopted both a totality of the circumstances test, see United States v. Lloyd, 43 F.3d 1183, 1186 (8th Cir. 1994), and a two-tiered test articulated in United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978). The two-step Robertson inquiry requires courts to consider: (1) whether the defendant "exhibited an actual subjective expectation to negotiate a plea at the time of the discussion," and (2) whether the defendant's "expectation was reasonable given the totality of the objective circumstances." Id. Although the Third Circuit has not expressly adopted either approach, districts courts within

this circuit have applied both standards to evaluate whether a defendant's statements fall within the scope of FED. R. EVID. 410 and FED. R. CRIM. P. 11. See e.g. Stein, 2005 WL 1377851, at *9 (applying the totality of the circumstances test); United States v. Washington, 614 F. Supp. 144, 149 (E.D. Pa. 1985), aff'd, 791 F.2d 923 (3d Cir. 1986) (applying the two-tiered Robertson test); United States v. Jasin, 215 F. Supp. 2d 552, 586 (E.D. Pa. 2002) (same). Regardless, "under either test, the court must consider whether [the] Defendant subjectively believed that the statement was part of [a] proffer and whether that belief was objectively reasonable." United States v. Bard, No. 1:12-CR-181, 2013 WL 1882984, at *4 (M.D. Pa. May 6, 2013), aff'd in part, 625 F. App'x 57 (3d Cir. 2015).

Here, Defendant Wylie did not make Statement 1 and Statement 2 during a prescheduled reverse proffer session, but during an informal encounter that immediately followed his criminal detention hearing. Despite the impromptu nature of this meeting, Defendant Wylie made the statements at issue in the presence of his defense counsel, two (2) law enforcement officials, and the government's attorney[16] without renewed Miranda warnings. The record further

---

[16] The government argues that Statement 1 and Statement 2 fall outside the scope of FED. R. EVID. 410, as the prosecuting attorney was merely present to participate in Defendant Wylie's initial detention hearing. Nonetheless, when the conversation began, the prosecuting attorney did not object to the discussion or

suggests that Attorney Latella initiated the conversation to ultimately encourage Defendant Wylie's engagement in the plea negotiation process. In this context, where criminal liability had clearly attached, Defendant Wylie expressed a willingness to cooperate and indeed participated in a "full interview" merely twenty-two (22) days later.

Given these facts, the court finds that Defendant Wylie uttered Statement 1 and Statement 2 under the subjective belief that a preliminary plea discussion was underway and that, based on the totality of the circumstances, such a belief was objectively reasonable. Although not a formal proffer meeting, the December 2015 discussion initiated the overall plea-bargaining process with Defendant Wylie. See United States v. Ross, 588 F. Supp. 2d 777, 783 (E.D. Mich. 2008) (holding that preliminary meetings where "the parties' interest in embarking on plea discussions is assessed . . . constitute plea negotiations [under FED. R. EVID. 410], albeit, perhaps, only in their nascent stages."); United States v. Bridges, 46 F. Supp. 2d 462, 465 (E.D. Va. 1999), aff'd, 217 F.3d 841 (4th Cir. 2000) ("[S]tatements made in an effort to initiate plea bargaining fall within the definition of plea discussions under [FED. R. EVID. 410 and FED. R. CRIM. P. 11]."); United States v. Serna, 799 F.2d 842, 849 (2d Cir. 1986), abrogated on other grounds by United States v. DiNapoli, 8 F.3d 909 (2d Cir.

otherwise disclaim Special Agent Burke's authority to facilitate Defendant Wylie's cooperation.

1993) (holding that an informal, preliminary discussion with the prosecutor "must be considered as a part of the overall plea bargaining process"). As such, Statement 1 and Statement 2 are inadmissible under FED. R. EVID. 410 and FED. R. CRIM. P. 11. The court will therefore grant Defendant Wylie's motion to suppress the statements he made following his detention hearing on December 29, 2015.

**Conclusion**

For the reasons stated herein, Defendant Wylie's pretrial motion, (Doc. 362), will be granted in part and denied in part. Specifically, we will deny the motion to dismiss Counts 4 and 5 of the indictment. We will also deny the motion to suppress evidence seized from the Packages and the motion to suppress evidence seized from the Premises. However, we will grant the motion to suppress Defendant Wylie's post-suppression hearing statements. An appropriate order follows.

**BY THE COURT:**

**Date: February 11, 2020**

**/s James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Judge**